# *Vanguard Consulting, LLC*

---

**FORENSIC MITIGATION EVALUATION REPORT**

**Name: Marcus Rashawn Smith**                                   **Case No: 2:06-cr-021-W**
**Date of Birth: 05/16/1976**                                                        **Age: 31**
**Date of Evaluation: Ongoing**                    **Date of Report: March 16, 2008**
**Counsel: Charles Vercelli**

**REFERRAL INFORMATION:**

Marcus Rashawn Smith, a 31-year-old, African American, single male, was referred for a forensic sentence mitigation evaluation by his counsel. Judge Susan Russ Walker of the District Court of the Untied States for the Middle District of Alabama, Northern Division, subsequently approved the motion July 12, 2007. Marcus has been found guilty of two counts each of **Bank Robbery, Possession of a Firearm in connection with a Crime of Violence, and Felon in possession of Firearm.**

Please Note: This report is atypical in that not all standard sentence mitigation items were completed.

**NOTIFICATION:**

Marcus was initially informed of the purpose of the evaluation. Marcus was informed of the limited confidentiality of the information that would be obtained and signed a confidentiality release, a release for medical information, a release for psychological information, and a general information release. Marcus was informed that the results would be released to the court in a written report, with copies made available to his counsel and the District Attorney. Marcus was also informed that these results might be used in court proceedings either in written form or through testimony by the examiner. Marcus stated he understood and signed the releases. It was later noted that Marcus has receptive and expressive language deficits; therefore, it is possible Marcus did not fully understand the nature of the releases.

He presented clinically as generally reality based and oriented to person, place, time, and situation. There was no suggestion of psychotic process present, and he was able to attend and communicate. Indications were of some limited intellectual capacity.

**SUMMARY OF ALLEGED OFFENSE:**

According to information provided by Marcus' counsel, on November 17, 2005 and again on January 6, 2006, Marcus robbed a bank in Hayneville, Alabama. Marcus was subsequently found guilty and awaits sentencing.

Post Office Box 70245                                                                                                     (334) 220-6242
Montgomery, AL  36107                                                                                         Fax: (334) 395-6481
Email: drjdm@vanguardconsulting.net
www.vanguardconsulting.net

**SOURCES OF INFORMATION:**

Protocols completed and test procedures administered to evaluate the current matter included the following:

Behavioral Observation and Brief Clinical Interview with Marcus
Court Testimony-Mr. and Mrs. Bell; Joe T. Smith, younger brother
Interviews-Mrs. Bell; Joe T. Smith, younger brother
Telephonic interviews with defendant's counsel
Miller Forensic Assessment of Symptoms Test (M-FAST)
Mini Mental State Exam (MMSE)
Review of Records: Youngstown, Ohio city school system; various court records.
Slosson Intelligence Test-Revised (SIT-R)

**CURRENT MEDICATIONS:**

Marcus reports he is not currently on any medications. He reports some problems with memory, sleeping, and mood. It is recommended Marcus be evaluated for possible depression.

**HISTORY:**

Examiner met with Marcus at the Montgomery City Jail on November 2, 2007. Marcus provided the following personal information. He stated that he was born in Demopolis, Alabama to Joe Bell and Elizabeth Smith. He is the eldest of three children born of his mother and father. He has a younger brother, Joe, Jr., 28 years old, and a younger sister, Renita, 27 years old. Marcus' parents married when he was about 3 years old, but he states they are now separated.

Marcus reports he has never married and has one child, a daughter, 13 years old, who lives in Tuscaloosa with her mother, Shani Pope. However, in an interview on March 1, 2006 by Rena Ross, he related that he also has an older daughter, Tiffany, 19 years old, who resides in Youngstown, Ohio.

Marcus' counsel related that Marcus was horribly abused as a child. For example, he was 'hogtied' with an electrical cord, hung upside down, and then beaten. There are reportedly other instances of this level of abuse as well as equally horrific elements of neglect in Marcus' childhood. Mr. Bell testified on the stand that he would tie his son's feet and hands and hang him from the rafters, reportedly to prevent him from running away from punishment There are no records that reflect the Smith/Bell family was visited by Child Protective Services or that a Child Abuse/Neglect (CA/N) report was filed. In court testimony, both his parents stated they were visited on a couple of occasions by the Department of Human Resources (DHR), ordered into a parenting class, and "…things improved after their attendance." No reason was cited for why DHR visited the family.

Both parents and Marcus' younger brother testified that Marcus began setting fires in the house and in the yard at age 4 years. At 5 years, the father testified that Marcus set a mattress fire in a closet that jeopardized his younger brother's life. He stated he doused the

SMITH, MARCUS
Case No. 2:06-cr-021-W
Page 3 of 12

flames and made Marcus stay in the closet. He reported that Marcus stopped setting fires after this 'lesson.' Joe T. reported this was not the case, and that Marcus continued to set fires. He also stated that his father, in fact, did place Marcus in the closet while the mattress was still burning.

From an interview attended by Rena Ross March 1, 2006, Marcus reported that when he was 7 or 8 years old, his babysitter, who was 21 or 23 years old, began sexually molesting him. He denies she forced intercourse but stated she would fondle him. He stated he called her his girlfriend.

Marcus' mother testified in court that Marcus began to run away at age 9 years and was not missed by the family, sometimes for days. When he voluntarily returned home, he would be tied, isolated, beaten, or all three.

Marcus' education records from Youngstown, Ohio school district indicate he repeated 1st grade and dropped out of school during 10th grade. In 4th and 5th grades, Marcus failed but was promoted anyway. He has not achieved his equivalency.

He was in a specialized educational program in secondary school, and his records reflect he had trouble in school both academically, emotionally, and behaviorally. There is also indication that he attended school in a juvenile justice type environment. More information as to curriculum, offense(s), and so on, is not available at this time. His school psychological evaluations reflect that he had behavioral issues in school from a young age.

Please note this is an incomplete history.

**FAMILY INTERVIEWS:**

Mrs. Bell

On March 3, 2008, evaluator met with Mrs. Bell. She related that Marcus' conception, labor, and delivery were without incident. She stated that Marcus was a crier and fussy. Many times, she felt unable to care for him so Marcus would stay with her mother. When Marcus cried as an infant, she would blow in his face to distract him. She denied ever doing anything else to the infant. She stated that her mother would give Marcus corn liquor and Paregoric (camphorated tincture of opium) from about the time Marcus was 2-3 weeks old until he was about 4 months old, when his grandmother moved away. His mother related that there were no more drugs after her mother moved so she began to give Marcus cough syrup very regularly to keep him quiet.

While Marcus was growing up, Mrs. Bell related that Marcus did not always get his vaccinations on time. Other indications of abuse and neglect are prevalent as well. Mrs. Bell stated that her husband hit on Marcus' left ear when he was very young and that now Marcus "…favors his right ear." There was no medical follow-up nor aural testing for Marcus. She also reported that Marcus' father would whip him with various items, and that Marcus has scars on his back as a result.

She stated that when Marcus was about 9 years old he told her he would hear voices. There was no medical follow-up. According to testimony, the maternal Family of Origin has over one-half dozen relatives with mental disease, mental institutionalization, or active schizophrenia. Research reflects that schizophrenia and shizoaffective disorders have a strong genetic component. Eighty-three to eighty-eight percent (83-88%) of risk for schizophrenia is

inheritable, with the remainder attributable to local environmental risks[1]. Additionally, child abuse is a causal factor for psychosis and schizophrenia and, more specifically, for hallucinations, particularly voices commenting and command hallucinations[2].

<u>Joe T. Smith</u>

Joe T. Smith, Marcus' younger brother was also interviewed on March 3, 2008. Joe T. stated that their father needed little provocation to initiate punishment and that punishment would be severe. When asked why he did not testify to this while on the stand, he stated he did not see an opportunity and was also somewhat nervous and occasionally confused. Joe T. spoke of when his father hit Marcus on the head with a .44 magnum revolver when Marcus was young. He stated that Marcus "looked unconscious," and that now Marcus has no hearing in his left ear.

Joe T. related that his father's punishments were "too severe." For example, he used a fan belt to beat about Marcus' head. He stated that his brother's head was "…so swollen" from the beating. He reported that once, Marcus could not walk for a week because "…his bones were out of place." There was no medical treatment for any abusive incident noted.

Joe T. told of learning to recognize when his brother's "personality" would change. It would appear as if someone else was present; that Marcus could be fine one minute and become mean, or worse, the next. (His parents also related similar stories). He gave an example of when he and Marcus were young and playing with a BB gun. Joe T. stated he could see Marcus' face change and knew that Marcus was going to shoot him with the BB gun. He also related that Marcus would always state, "I don't know," when asked why he did such a thing.

Joe T. also told of when his father beat his mother so badly that she miscarried a child (before the youngest son was born). He spoke of other inhumanities to his family, but because he fears possible retribution for him or other family members, this evaluator will not relate them here.

Evaluator declined to interview father as there was no security nearby, and evaluator felt it might be dangerous.

**<u>MEDICAL HISTORY AND OBSERVATIONS:</u>**

Incomplete records.

**<u>CRIMINAL HISTORY:</u>**

Marcus has a history of criminal activity. He was incarcerated for 5 years for Robbery and was paroled. He violated his parole and was finally released September 19, 2004.

This section is incomplete.

**<u>PSYCHIATRIC HISTORY AND OBSERVATIONS:</u>**

Other than records received from Youngstown, Ohio city school system and noted in the History section of this report, this section is incomplete. School psychological evaluations are noted in the Intelligence section of this report.

---

[1] Cardno AG, Gottesman I. 2000. **Twin Studies of Schizophrenia: From Bow-and-Arrow Concordances to Star Wars MX and Functional Genomics.** American Journal Medical Genetics, <u>97</u>:12-17.
[2] **Childhood Trauma, Psychosis and Schizophrenia: A Literature Review With Theoretical and Clinical Implications.** 2005. Acta Psychiatry Scandinavica: <u>112</u>: 330–350.

## BEHAVIORAL OBSERVATIONS

### COMMUNICATION BARRIERS PRESENT:

During the initial interview, Marcus was engaged in the process. His short-term memory appeared to be mildly impaired. He appeared to have receptive and expressive deficits that might interfere with his ability to fully understand some aspects of the interview process and the testing. Evaluator had to ask Marcus to repeat things often because of unintelligibility.

### MOVEMENT/ACTIVITY:

During clinical interview/assessments, Marcus was calm and cooperative. He was not easily distracted and was able to remain focused. The facility room was very cramped. It was very noisy but Marcus remained focused.

## CLINICAL EVALUATION

## INTELLIGENCE

### PRIOR TESTING:

The following is a brief summary of the prior testing Marcus received in school.

Marcus was first evaluated when he was 6 years old. His IQ was 76, as scored by the Stanford Binet IQ Test, and he was identified as being in the Slow Learning range of scholastic aptitude. NOTE: There was no indication in this or subsequent reports of the horrors Marcus was enduring at home. (The Stanford Binet IQ Test is an individually administered assessment of intelligence and cognitive abilities It measures fluid reasoning, knowledge, quantitative reasoning, visual-spatial processing, and working memory. It is designed to test individuals ages 2 to 85+ years.)

Marcus was evaluated at age 8 years old. His IQ was reported as 90 by the Stanford Binet IQ Test. It was reported that Marcus' mental age (MA) was only mildly behind his chronological age (CA; i.e., CA=7 years 11 months, MA=7 years 6 months) at that time.

Marcus was evaluated at 10 years old. His Full Scale IQ was found to be 78 by the Wechsler Intelligence Scale for Children-Revised (WISC-R), an indication of borderline intelligence. At this evaluation, Marcus was diagnosed with Attention Deficit Disorder with Hyperactivity and Mixed Specific Developmental Disorder. It was noted Marcus had difficulty with auditory processing and auditory sequential memory as well as visual perception and visual-motor coordination.

Marcus was evaluated at 11 years old. His Full Scale IQ was found to be 81 by the WISC-R, still in the low normal range of intellectual functioning. It was found he had a severe behavioral handicap.

When Marcus was 13 years old, he was evaluated again. His Full Scale IQ was found to be 96 by the WISC-R, which placed him in the 39th percentile of individuals the same age.

SMITH, MARCUS
Case No. 2:06-cr-021-W
Page 6 of 12

Marcus was determined to have deficits in many areas of academic, personal, and social development. His behavior was described as impulsive. He was found to have poor peer relationships and was excessively defensive with low self-esteem and depression.

To assist the reader, the following summary table highlights the Full Scale IQ scores for Marcus.

| Age | VIQ | PIQ | FSIQ |
|---|---|---|---|
| 6 years | | | 76* |
| 8 years | | | 90* |
| 10 years | 84 | 74 | 78# |
| 11 years | 82 | 81 | 81# |
| 13 years | 96 | 98 | 96# |

VIQ=Verbal IQ; PIQ=Performance IQ; FSIQ=Full Scale IQ
*Stanford-Binet IQ Test
#Wechsler Intelligence Scale for Children-Revised

Please note this section may be incomplete.

**CURRENT TESTING**

The current investigation included screening Marcus' functioning and orientation.

**SLOSSON'S INTELLIGENCE TEST-REVISED (SIT-R):**

The SIT-R was administered on October 2, 2007. The SIT-R yields total standard scores by age level for ages 4 years through adult. The mean is 100 and the standard deviation[@] is 16. The SIT-R was chosen to determine Marcus' functioning level. The SIT-R assesses one's ability to understand vocabulary, general information, similarities and differences, comprehension, quantitative ability, and auditory memory. Marcus was unable to complete the requisite consecutive answers correctly at the 18+ age level. Using a backward progression, Marcus achieved the requisite passing score at an <u>8 years of age level</u>.

Marcus scored a standard score of 62 with a 95% probability that his true score is between 55 and 69. His equivalent Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) score (i.e., 64) would place him in the Mild Mental Retardation range of functioning. A WAIS-III was not administered due to the fact that this was considered a screening review to determine further need of investigation, and further testing was not approved.

[@]*SD* approximates the average distance a score falls from the mean.

**MILLER FORENSIC ASSESSMENT OF SYMPTOMS TEST (M-FAST)**

The Miller Forensic Assessment of Symptoms Test (M-FAST) is a brief 25-item screening interview for individuals ages 18 years and older that provides preliminary information regarding the probability that he/she is feigning psychiatric illness. Most malingering and

symptom validity instruments assess malingered cognitive and/or neuropsychological deficits. The M-FAST focuses exclusively on malingered psychiatric illness. The M-FAST was developed and validated with both simulation and known-groups samples. The validity of the instrument also has been demonstrated across genders, ethnic groups (Caucasian and African American), and settings (e.g., V.A. hospitals, correctional institutions, and inpatient/outpatient treatment facilities).

The M-FAST was administered to rule out a possibility that Marcus would feign mental illness. Marcus' Total Score was 8 out of a possible 25. The M-FAST Total score provides an estimate of the likelihood that the respondent is malingering psychopathology. A Total Score of 6 or greater is highly suggestive of malingered psychopathology in both clinical and nonclinical samples.

Marcus' score might be interpreted as a 'cry for help.' In Marcus' case, it might reflect how he has learned to cope given his abusive history. Finally, experientially speaking, incarcerated individuals tend to present with more mental health issues. There may be many reasons other than merely feigning such as those who have a criminal history do also tend to have mental disorders. However, the research lags in this area, so no definitive answer can be offered at this time. Further assessment should be conducted.

**CLINICAL IMPRESSIONS:**

Marcus appeared to be coherent and to be free of any abnormal thought processes. (It should be noted that a full historical record from Marcus was not received.) His speech was normal and at times difficult to understand. The examiner had to ask him to repeat himself on multiple occasions. He seemed engaged. His affect was appropriate.

During the clinical interview/assessments, Marcus had difficulty understanding concepts, phrases, or general knowledge questions. He lacks insight even though it is sometimes apparent he is attempting to understand a problem or convey an idea. He appears to have great difficulty understanding even moderately complex concepts.

Clinical impressions are of significantly sub-average intelligence, possible chronic polysubstance abuse, and possible brain damage secondary to extreme physical and emotional abuse and neglect. He appears to suffer from expressive and receptive language deficits. He also appears to be suffering some short-term memory loss. According to past evaluations, Marcus has a long history of poor impulse control and judgment. Other impressions cannot be made due to the lack of further investigation at this time.

It should be ruled out whether Marcus suffers from some form of schizophrenia or schizoaffective disorder as he has over one-half dozen maternal relatives with mental disease or the like. There is research to reflect intergenerational patterns as noted by Dr. Joseph Coyle, MD[3].

Cognitive symptoms of schizophrenia … involve deficits in:

---

[3] **Treating the Negative Symptoms of Schizophrenia: An Expert Interview With Joseph Coyle, MD**
Medscape Psychiatry & Mental Health. Expert Interview. Posted Online 11/13/2006

- Memory;
- Decision making; and
- Problem solving.

Most evidence has indicated that these symptoms are present at the very beginning, when the disorder is first diagnosed. The diagnosis of schizophrenia typically occurs when the psychosis or the positive symptoms appear. These cognitive symptoms are enduring and they correlate with the third domain, which includes negative symptoms.

Negative symptoms are a little more difficult for people to understand because they involve the absence of something, not the addition. Negative symptoms include:

- Social isolation;
- Lack of initiative;
- Socially awkward behavior; and,
- Discomfort when interacting with people.

The negative symptoms tend to become more prominent over the course of the disorder. Together, negative and cognitive symptoms are associated with the persistent disability that is seen in individuals with schizophrenia.

**SUMMARY:**

Marcus was administered the SIT-R, the MMSE, and the M-FAST at the Montgomery City Jail. The room was cramped and the environment very noisy. Marcus was engaged and pleasant. Marcus was oriented on all spheres.

On the SIT-R, Marcus was unable to complete the requisite consecutive answers correctly at the 18+ age level. Using a backward progression, Marcus achieved the requisite passing score at an 8 years of age level.

Marcus received a Total Score on the M-FAST of 8. A Total Score of 6 or greater is highly suggestive of malingered psychopathology in both clinical and nonclinical samples. However, there might be alternative reasons for his total score. Additional information should be obtained.

Marcus appears to operate at a Mild Mental Retardation level of intellectual functioning as indicated by his screening score on the SIT-R and from some previous evaluations. He was in special education in school and completed school only to the 9th grade (by all accounts of his available school records). He was placed in an alternative school in 1990. It is unclear if he remained there until he dropped out in the 10th grade.

Marcus lacks good insight or judgment. He has poor impulse control, evident from his school and criminal records. Marcus had difficulty with his expressive and receptive language. He displayed appropriate affect. There were no signs of malingering or deception.

It has been reported that Marcus suffered from extreme physical, psychological, and emotional torture and neglect as a child. He was also sexually abused by a babysitter when he was a child. He suffered from auditory hallucinations, fire setting behavior, and what was described as a change in personality from one minute to the next.

    Marcus was problematic at school, being described as severely behaviorally handicapped and eventually was placed in an alternative school. There was no apparent intervention at home through Child Protective Services other than somehow the parents were asked to attend parenting class.

**RECOMMENDATIONS:**

    This report is considered incomplete. It is recommended that Marcus undergo a complete psychiatric workup to determine the extent of his psychiatric, psychological, and neurological problems due to the severity of the long-term abuse. There is a history of mental disease, schizophrenia, and possible schizoaffective disorder in his mother's family.

**CONCLUSIONS**

    Caveat: incomplete histories and records (e.g., medical, psychological, educational, SSI, prior arrests, full family interviews, collateral interviews, personality testing, full IQ testing, Department of Human Services, treatment) were provided.

    The extent of Marcus' abuse would certainly have derailed his development in all areas. The lack of appropriate intervention nearly assures Marcus life-long struggles of a wide variety. That he has been in trouble with the law from an early age is also no surprise. Research reflects that disruptions…in the parents' application of family-management practices have consistently been found to correlate with preadolescents' antisocial behavior. …parents of these children were deficient in the practice of a number of interrelated skills: monitoring the child's whereabouts, using effective discipline for antisocial behavior, employing effective problem-solving skills, and supporting the development of prosocial skills[4].

    It is noted in his records and through testimony that he was unable to develop peer relationships; that he seemed unhappy and depressed. Interestingly, one evaluator (1984) also noted that Marcus' behavioral problems were "…*more superficial*…" and that he had "…the capacity to function in regular class with positive reinforcement and direction." There were no notations or suggestions found that might indicate the suffering Marcus was enduring during this time and that this might have been the underlying problem with his learning and behavior. There were no referrals for treatment found.

    It is impossible to understand how Marcus might have otherwise developed because of the extreme abuse he endured while growing up. There was little, if any, intervention. Outside of placement in an alternative school and multiple psychological school evaluations, there are no records to support that there was appropriate intervention for Marcus to aid him in overcoming the abuse. He most certainly suffered from attachment disorder from infancy.

    It is unknown if Marcus has neurological issues as no medical records are available. It seems likely that, if as has been said, Marcus was a smart boy, but now suffers from Mild Mental Retardation, that something in the interim interfered with his neurological foundation. More likely it is a combination of severe physical and sexual abuse and polysubstance abuse beginning from an early age (2-3 weeks old). Regardless of the genesis, there does appear to be some marked limitations to Marcus' abilities to navigate successfully through life.

---

[4]**The Correlation of Family Management Practices and Delinquency**. 1984. Gerald R. Patterson, Magda Stouthamer-Loeber. *Child Development*, 55(4): 1299-1307.

Additionally, as a result of the sexual abuse he endured at age 7 or 8 years, Marcus would have certainly begun to be confused regarding boundaries between children and adults and boundaries as they pertain to his 'space' and other people's space. He was repeatedly evaluated because of poor peer relationships, for example.

According to research, the relationship between child sexual abuse and adult psychopathology tended initially to be conceptualized in terms of a chronic form of posttraumatic stress disorder (PTSD). This model focuses on trauma-induced symptoms, most particularly dissociative disorders such as desensitization, amnesias, fugues, and even multiple personality. The idea is that the stress-induced symptoms engendered in the process of the abuse and have reverberated down the years to produce a post-abuse syndrome in adult life[5]. Marcus' history reflects many of these disorders/symptoms. For example, it is likely he is very easily led. It seems <u>unlikely</u> that Marcus would be the initiator, but would likely make an excellent cohort, if given proper instruction and oversight. He has what might be described as amnesia moments, alterations in personality (most likely dissociative in nature), and PTSD symptoms (e.g., frustration, low self-esteem, etc.).

The fact is, Marcus received very little intervention in his life, and any he received was in response to his behavioral issues, not the underlying reasons for these issues. One disorder joined with the next disorder (and so on) in his psychological profile. A good argument could be made that Marcus never really had a chance for normalcy. Finally, Marcus also fits the profile of someone who would be at risk while incarcerated.

Conclusions and opinions herein are clinical in nature and are not intended to recommend or suggest legal outcomes. The ultimate legal questions herein can only be decided by competent legal authority. The opportunity to have been of service is appreciated. If we can provide further information or elucidation on the findings contained herein, please do not hesitate to call upon us.

Respectfully Submitted,

_____
Dr. J. Davis Martin, Ph.D.
Board Certified Forensic Psychological Evaluator
Board Certified Expert in Traumatic Stress
Board Certified in Professional Counseling
Clinically Certified Forensic Counselor
Certified Sentence Mitigation Specialist
Fellow, American Academy of Experts in Traumatic Stress
Fellow, American Board of Forensic Counselors
Fellow, American Psychotherapy Association
Diplomate, National Board of Forensic Examiners
Licensed Professional Counselor, NJ #37PC00226300

---

[5] Lindberg & Distad 1985; Bryer et al. 1987; Craine et al. 1988. Cited in *Issues in Child Abuse Prevention*. 1998. 9(Autumn). **Long-Term Effects of Child Sexual Abuse**. Ed: Paul E Mullen & Jillian Fleming**.**

**FYI**

**MENTAL HEALTH AND GROWING UP, THIRD EDITION**
**CHILD ABUSE AND NEGLECT**
**FACTSHEET 19: CHILD ABUSE AND NEGLECT - THE EMOTIONAL AFFECTS: FOR PARENTS AND TEACHERS**

**INTRODUCTION**

*What is child abuse?*

All parents upset their children sometimes. Saying `no' and managing difficult behavior is an essential part of parenting. Tired or stressed parents can lose control and can do or say something they regret, and may even hurt the child. If this happens often enough, it can seriously harm the child. That is why abuse is defined in law. The Children Act 1989 states that abuse should be considered to have happened when someone's actions have caused a child to suffer significant harm to his or her health or development.

**Significant harm** means that someone is:

- punishing a child too much
- hitting or shaking a child
- constantly criticizing, threatening, or rejecting a child
- sexually interfering with or assaulting a child
- not looking after a child - not giving them enough to eat, ignoring them, not playing or talking with them, or not making sure that they are safe.

**WHO ABUSES CHILDREN?**

Children are usually abused by someone in their immediate family circle, this can include parents, brothers or sisters, babysitters, or other familiar adults. It is quite unusual for strangers to be involved.

**HOW CAN YOU TELL IF A CHILD IS BEING ABUSED?**

**Physically abused** children may be:
- watchful, cautious, or wary of adults
- unable to play and be spontaneous
- aggressive or abusive
- bullying other children or being bullied themselves
- unable to concentrate, underachieving at school, and avoiding activities that involve removal of clothes, e.g. sports
- having temper tantrums and behaving thoughtlessly
- lying, stealing, truanting from school, and getting into trouble with the police
- finding it difficult to trust other people and make friends.

**Sexually abused** children may:
- suddenly behave differently when the abuse starts

- think badly of themselves

- not look after themselves

- use sexual talk or ideas in their play that you would usually see only in someone much older

- withdraw into themselves or be secretive

- set fires or harm animals/pets

- under-achieve at school

- start wetting or soiling themselves

- be unable to sleep

- behave in an inappropriately seductive or flirtatious way

- be fearful, frightened of physical contact

- become depressed and take an overdose or harm themselves

- run away, become promiscuous or take to prostitution

- drink too much or start using drugs

- develop an eating disorder such as anorexia or bulimia.

**Emotionally abused** or **neglected** children may:

- be slow to learn to walk and talk

- be very passive and unable to be spontaneous

- have feeding problems and grow slowly

- find it hard to develop close relationships

- be over-friendly with strangers

- get on badly with other children of the same age

- be unable to play imaginatively

- think badly of themselves

- be easily distracted and do badly at school.

It can be hard to detect **long-standing abuse** by an adult the child is close to. It is often very difficult for the child to tell anyone about it, as the abuser may have threatened to hurt them if they tell anybody. A child may not say anything because they think it is their fault, that no one will believe them or that they will be teased or punished. The child may even love the abusing adult. They want the abuse to stop, but they don't want the adult to go to prison or for the family to break up.

© [2004] Royal College of Psychiatrists.